

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  RAHIMA NASERY | Case No.: 16cv1534-CAB-KSC |
| 12              Plaintiff, | **REPORT AND RECOMMENDATION** |
| 13  v. | **RE CROSS-MOTIONS FOR** |
|  | **SUMMARY JUDGMENT** |
| 14  CAROLYN W. COLVIN, Acting | |
| 15  Commissioner of Social Security, | **[Doc. Nos. 14 and 16]** |
| 16              Defendant. | |

17       Pursuant to Title 42, United States Code 405(g), of the Social Security Act ("SSA"),

18  plaintiff Rahima Nasery ("Plaintiff") seeks judicial review of the Acting Commissioner

19  of Social Security's ("Commissioner") final decision denying her disability insurance

20  benefits.[1] [Doc. No. 1, at p. 1.] All matters arising in this social security appeal were

21  referred to the Honorable Karen S. Crawford, United States Magistrate Judge, for Report

22

23

24

25  [1] Title 42, United States Code, Section 405(g), provides as follows: "Any individual, after any final
decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may
26  obtain a review of such decision by a civil action . . . brought in the district court of the United States. . . .
The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming,
27  modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding
the cause for a rehearing. The findings of the Commissioner . . . as to any fact, if supported by substantial
28  evidence, shall be conclusive. . . ." 42 U.S.C. §405(g).

and Recommendation pursuant to section 636(b)(1)(B) of Title 28 of the United States Code and Local Rule 72.1. [Doc. No. 11, at p. 1.]

Presently before the Court are: (1) plaintiff's Motion for Summary Judgment [Doc. No. 14]; (2) defendant's Cross-Motion for Summary Judgment [Doc. No. 16]; (3) plaintiff's Reply in Support of Motion for Summary Judgment [Doc. No. 18]; and (4) the Administrative Record [Doc. No. 10].

Plaintiff's Motion for Summary Judgment challenges the denial of disability benefits on the basis that the Administrative Law Judge ("ALJ") failed to properly consider impairments plaintiff allegedly suffered prior to December 2011. [Doc. No. 14-1, at p. 6.] Plaintiff argues that (1) she was disabled prior to December 31, 2011; (2) the ALJ's decision is not supported by substantial evidence; and (3) the ALJ erred by not seeking expert testimony and/or lay testimony. *Id.* at p. 1. Defendant contends the decision to deny benefits should be upheld because the ALJ's analysis and decision were supported by substantial evidence and are legally sufficient. [Doc. No. 16-1, at p. 5.]

After careful consideration of the moving and opposing papers, as well as the Administrative Record and the applicable law, this Court RECOMMENDS that the District Court GRANT plaintiff's Motion for Summary Judgment [Doc. No. 14]; DENY defendant's Cross-Motion for Summary Judgment [Doc. No. 16]; and remand the case back to the Commissioner for further proceedings.

## I. *Background and Procedural History*

Plaintiff was born on August 3, 1966 in Afghanistan. [AR 142.] She moved to the United States as a child and became a citizen of the United States on June 6, 2006. *Id.* Plaintiff worked as a sales agent from 1998 through 2006 at Nordstrom and Neiman-Marcus, which qualified her for disability insurance. [AR 148-152.]

On May 23, 2012, plaintiff applied for disability benefits claiming she was unable to work as of January 1, 2007. [AR 48, 153.] Plaintiff claimed in her application that she suffered from: "arthritis, back pain, numbness, headache, dizziness, cholesterol, hypertension, memory loss, insomnia, depression [and] brain tumor." [AR 48-49.]

On June 6, 2012, plaintiff had an in-person interview with a Social Security representative, "V. Pham." [AR 153-155.] During the interview, the Social Security representative completed a form titled "Disability Report – Field Office – Form SSA-3367." [AR 153-155.] The interviewer observed plaintiff had no difficulty hearing, reading, breathing, understanding, concentrating, talking, answering, sitting, standing, walking, seeing, writing, or using her hands during their meeting. [AR 154.] The report indicates that plaintiff was "well dressed and cooperative during the interview." *Id*. The report also indicates that plaintiff was last insured on December 31, 2011. [AR 153, 145; Doc. No. 14-1, at p. 8.]

The record also includes a second form completed by the plaintiff titled "Disability Report – Adult – Form SSA-3368." [AR 156-163.] Several responses on the form are blank and it is unsigned and undated.[2] *Id*. In this report, plaintiff lists the following conditions that she claims limit her ability to work: "arthritis, back pain, numbness, headache, dizziness, cholesterol, hypertension, memory loss, insomnia, depression, and a brain tumor." [AR 157.] In section four of the report, plaintiff indicates that she stopped working on December 31, 2006, "[b]ecause of [her] condition(s)." *Id*. In response to the question of whether her condition caused her to make changes in her work activity, plaintiff indicates "no." *Id*. Plaintiff's reported job history in section six of the report indicates that she worked as a convenience store cashier from 1995 to 1996. [AR 158.] Plaintiff worked as a sales associate at various department stores from May 15, 1997 to December 31, 2006. [AR 158.] As a cashier, plaintiff worked four hours per day, three days per week, for $6.00 per hour. *Id*. As a sales associate, she worked seven hours per day, five times per week, for $10.80 per hour. *Id*.

_____

[2] The Court Transcript Index indicates that the form is dated June 6, 2012. [Doc. No. 10-1, at p. 2.]

16cv1534-CAB-KSC

The record includes a third form titled "Work History Report – Form SSA-3369." [AR 164-171.] Several responses on the form are blank, and it is unsigned and undated.[3] *Id.* [AR 164-171.] The information included in this report is duplicative of what is in the other reports. *Id.*

The record includes descriptions of plaintiff's jobs as a cashier and sales associate. [AR 178-181.] As a cashier, plaintiff said she would wrap goods, weighing approximately ten pounds, and hand them to customers. *Id.* This job required plaintiff to stand for two hours a day and walk for two hours a day. *Id.* As a sales associate, plaintiff was required to stand for three hours a day and walk for four hours a day. [AR 179.] She wrapped and carried goods (weighing about 10 to 20 pounds) for clients. [AR 179.]

On August 23, 2012, plaintiff's application for social security disability benefits was denied. [AR 56, 72.] The reasons for the denial are as follows:

> In order to qualify for this program, you must be found to have been under a disability on or before 12/31/2011, the date you were last insured for disability benefits. Your records show that you have a history of treatment for these conditions. Although you experience discomfort in your back and joints, the evidence shows you are able to bend and move about and to use your arms, hands, and legs in a satisfactory manner. There is no indication of loss of control or muscle wasting due to nerve damage as a result of your condition. Although you have [hypertension], there is no indication [of] damage to your eyes, heart, liver, or kidneys as a result of this condition. Although we requested all of your records, there was not enough information available to determine the severity of your depression and to what extent it would limit your ability to work. Therefore, we cannot find you disabled at any time prior to 12/31/2011.

[AR 72.] The record contains the analysis of two state medical examiners in connection with plaintiff's initial disability determination, who determined that plaintiff was not disabled.[4] [AR 54-55; 52-53.]

---

[3] The Court Transcript Index indicates that the form is also dated June 6, 2012. [Doc. No. 10-1, at p. 2.]

[4] On August 20, 2012, Dr. Lizarraras, completed a Physical Residual Functional Capacity Assessment in connection with plaintiff's initial disability determination. [AR 54-55.] Dr. Lizarraras concluded that

On September 21, 2012, plaintiff requested reconsideration of this decision. [AR 185-192.] The record contains a Reconsideration Analysis of plaintiff's claim as reviewed by two state medical examiners, who affirmed the initial denial as written.[5] [AR 60.] Plaintiff's request for reconsideration was denied on February 4, 2013. [AR 66, 78.]

On February 11, 2013, plaintiff requested a hearing before an ALJ. [AR 84-85.] A hearing before an ALJ was held on July 10, 2014. [AR 31-47.] On September 18, 2014, the ALJ issued a written opinion concluding that plaintiff did not qualify for disability insurance benefits because she was not disabled through December 31, 2011, the date she was last insured for disability benefits. [AR 15-26.] The ALJ found that plaintiff had the residual functional capacity to perform her past relevant work as a retail sales clerk and cashier. *Id.* On November 13, 2014, plaintiff's attorney requested review of the ALJ's decision, and included new documentary evidence in her request.[6] [AR 11-14.] However, on April 22, 2016, the Appeals Council denied plaintiff's request for review. [AR 2.] If

---

plaintiff was able to lift and/or carry 50 pounds occasionally ("1/3 or less of an 8 hour day") and 25 pounds frequently ("more than 1/3 up to 2/3 of an 8 hour day"). [AR 54.] Dr. Lizarraras opined that plaintiff could stand and/or walk (with normal breaks) for "6 hours in an 8-hour workday." *Id.* Dr. Lizarraras also said that plaintiff could sit (with normal breaks) for "6 hours in an 8-hour workday." *Id.* Dr. Lizarraras determined plaintiff had no postural limitations, but had manipulative limitations reaching overhead with her left arm. [AR 54-55.] Dr. Lizarraras also considered plaintiff's pain and "[m]ild symptoms related to mild hypopituitarism." *Id.*

On August 21, 2012, Dr. Amado completed a Psychiatric Review of plaintiff. [AR 52-53.] Dr. Amado determined that plaintiff had "[n]o mental medically determinable impairments." [AR 53.] Dr. Amado noted in relevant part: "Psych issues are addressed only indirectly and in passing in the [plaintiff's] Kaiser MER on file, and psych impairments are not included in the 'active problems' list. There is no indication that a significant psych issue was present and demanding treatment, but in any case there is Insufficient Evidence to adjudicate. . . ." [AR 53.]

[5] On January 29, 2013, Dr. Gregg conducted a Reconsideration Analysis of plaintiff's psychiatric claim, and affirmed the initial decision as written. [AR 60.] On January 31, 2013, Dr. Spinka conducted a Reconsideration Analysis of plaintiff's claim and found, "I have reviewed the evidence in the file and the assessment of 8/21/12 is affirmed as written." *Id.*

[6] Plaintiff included a letter from Dr. James S. Grisolia, M.D., a neurologist, dated June 24, 2014, and a medical evaluation authored by Dr. Harry Henderson, M.D., a psychiatrist, dated November 7, 2014. [AR 11-14.]

the Appeals Council denies review, the decision of the ALJ becomes the final decision of the Commissioner. 20 C.F.R. § 404.981. The Complaint in this action was then filed on June 18, 2016 seeking review of the Commissioner's final decision. [Doc. No. 1.]

## II. *Standard of Review*

The final decision of the Commissioner must be affirmed if it is supported by substantial evidence and if the Commissioner has applied the correct legal standards. *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). Under the substantial evidence standard, the Commissioner's findings are upheld if supported by inferences reasonably drawn from the record. *Id.* If there is evidence in the record to support more than one rational interpretation, the District Court must defer to the Commissioner's decision. *Id.* "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). "In determining whether the Commissioner's findings are supported by substantial evidence, we must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

> Summary judgment motions, as defined by Fed.R.Civ.P. 56, contemplate the use of evidentiary material in the form of affidavits, depositions, answers to interrogatories, and admissions. In Social Security appeals, however, the Court may 'look no further than the pleadings and the transcript of the record before the agency,' and may not admit additional evidence." *Morton v. Califano*, 481 F.Supp. 908, 914 n. 2 (E.D. Tenn.1978); 42 U.S.C. § 405(g). . . . [A]lthough summary judgment motions are customarily used [in social security cases], and even requested by the Court or Magistrate, such motions merely serve as vehicles for briefing the parties' positions, and are not a prerequisite to the Court's reaching a decision on the merits.

*Kenney v. Heckler*, 577 F.Supp. 214, 216 (N.D. Ohio 1983).

## III.  *Evidence in the Administrative Record*

Plaintiff alleges a disability onset date of January 1, 2007. [AR 18.]  To be eligible for disability benefits, plaintiff has to establish disability before the expiration of her disability insurance coverage on December 31, 2011. [AR 72.]  The relevant medical evidence pertaining to plaintiff's claim of disability is summarized below beginning with the medical evidence during the qualified period (January 1, 2007 through December 31, 2011), and medical evidence during the unqualified period (January 1, 2012 through the present).

### A.  *Medical Evidence During the Qualified Period (prior to December 31, 2011)*

The earliest medical record included in Administrative Record is dated October 8, 2008. *Id.*  On October 8, 2008, Dr. Ali Aboutaleb evaluated plaintiff as a new patient. [AR 206.]  Dr. Aboutaleb indicated in his notes that plaintiff had a history of diabetes, and that she had taken insulin for ten years. [AR 207.]  Dr. Aboutaleb also noted plaintiff was diagnosed with a pituitary tumor[7] in 1999, which was being treated medically, with no history of surgery to treat the tumor. *Id.*  In connection with plaintiff's pituitary tumor, Dr. Aboutaleb recommended that plaintiff "repeat the MRI for the [follow-up appointment]." [AR 208.]  According to plaintiff her last MRI was one year ago with no significant changes. *Id.*  Plaintiff's diagnosis also indicates hypothyroidism and "GERD." [AR 209.]

On October 28, 2008, plaintiff saw Dr. Aboutaleb for a follow-up appointment. [AR 216.]  Dr. Aboutaleb noted that plaintiff had a history of pituitary ademona diagnosed in 1999, diabetes and hypothyroidism, and "vertigo off and on, for yrs, better when takeing [sic] the Meclizine, worse when turning her head to the sides or up and down." *Id.*  In the "review of systems" section, Dr. Aboutaleb noted that plaintiff's neurological system was "positive for dizziness" but "negative for tingling." *Id.*

---

[7] Plaintiff's pituitary tumor, diagnosed in 1999, is sometimes referred to as "adenoma of pituitary" in her treating records. [Doc. No. AR 209.]

On November 10, 2008, plaintiff saw an endocrinologist, Dr. Derek Dwayne Mafong, to evaluate her pituitary mass. [AR 226.] Dr. Mafong's notes indicate that plaintiff was previously "being followed by Dr. Christiansen at Sharp," but was seeking to reestablish care with Dr. Mafong because she is a new Kaiser patient. [AR 227.] Dr. Mafong noted plaintiff would likely need ongoing MRIs to monitor the size of the pituitary mass. [AF 229.] Dr. Mafong also reported plaintiff had a normal range of motion, no joint pain, and was "negative for depression and memory loss." [AR 228.] He also noted that she was "not nervous/anxious." *Id.*

On December 12, 2008, Dr. Mafong summarized his review of plaintiff's medical records from Sharp. [AR 230.] He indicated that plaintiff had a "decrease in size of adenoma (hemorrhage vs. Due to bromocriptine) over the years." *Id.* He also noted that plaintiff had an MRI at Sharp in 2006 which showed no change from her MRI from 2005. *Id.* In 2006, plaintiff's MRI indicated an "8 mm hyperintense mass posterior pituitar[y] gland" and in 2008, her MRI indicated "perhaps 4- to 5-mm sized nodule lying within the pituitary fossa dorsal to the infundibulum." *Id.*

On December 17, 2008, plaintiff saw Physician Assistant ("P.A.") Jeanne Marie Brownell for a routine Pap smear. [AR 237.] In plaintiff's history, P.A. Brownell noted plaintiff's pituitary adenoma was shrinking. [AR 238.]

On September 25, 2009, plaintiff saw Michael Lee Simons, D.P.M. (Doctor of Podiatric Medicine) for complaints of continuous pain in her left foot for six months and intermittent pain in her right foot for one week. [AR 271.] Plaintiff rated the pain in her left foot as a seven out of ten, and the pain in her right foot as a three out of ten. *Id.* Plaintiff stated that she walked four miles a day on level terrain. *Id.* The exam revealed decreased arch height in static stance for both feet, and pain with crepitus in the first metatarsal phalangeal of the left foot. [AR 273.] A bilateral x-ray revealed "degenerative changes with dorsal exostosis 1st metatarsal head left 1st metatarsal phalangeal joint. Accessory ossicle 2nd & 5th metatarsal bilateral. Plantar calcaneus exostosis bilateral. Os peroneum bilateral." *Id.* Plaintiff was advised of the slow healing and possible

chronicity of her condition. [AR 274.] She was also advised about "foot wear" and "non-impact exercise." *Id.* Dr. Simmons ordered plaintiff to return to the clinic after two months using new custom orthotics. *Id.* The exam notes indicated that the "patient displays normal mood and affect." [AR 273.]

On January 12, 2010, plaintiff saw Dr. Dan S. Carpiuc for ear pain. [AR 293.] Dr. Carpiuc's physical exam notes regarding the patient's psychiatric condition indicated that plaintiff's "mood, affect and judgment normal." *Id.*

On January 15, 2010, plaintiff had a follow-up visit with Dr. Aboutaleb for a follow-up "of the lump and pain behind both ears." [AR 300.] In patient's review of symptoms, the record indicates that plaintiff was "positive for dizziness." *Id.* She was prescribed Clindamycin for her ear pain and was told to return if her symptoms worsen or fail to improve. [AR 302.]

On March 1, 2010, plaintiff had a follow-up visit with Dr. Mafong. [AR 308.] Dr. Mafong's report of plaintiff's recent MRI "showed stable intrapituitary mass." *Id.* His report also indicated that plaintiff's "mood, affect and judgment" were normal. [AR 310.] Plaintiff was instructed to schedule an MRI in one year, to repeat her labs in one year, and to schedule a follow-up visit with Dr. Mafong in one year. [AR 311.]

On March 17, 2010, plaintiff saw Dr. Aboutaleb for pain in her right arm for the last three days. [AR 318.] Dr. Aboutaleb's notes indicate that plaintiff "has had more physical work in the last few days, no injury or fall, no numbness, worse with activity and less at rest, no joint pain." *Id.* She was prescribed medication include Hydrocodone-Acetamiophen and Methocarbamol. [AR 319.] She was also advised to rest, apply a warm compress, and to use a sling. *Id.*

On April 20, 2010, plaintiff saw Dr. Mafong for a routine follow-up visit for her adenoma of pituitary. [AR 326.] Dr. Mafong did not note any significant changes in plaintiff's exam from her previous visit on March 1, 2010. [AR 327-330.] The "Psychiatric" section of the "Progress Notes" indicate that plaintiff's "mood, affect and judgment [were] normal." [AR 329.]

On April 27, 2010, plaintiff saw Dr. Aboutaleb for heart palpitations and left shoulder pain. [AR 337.] Plaintiff told Dr. Aboutaleb that for the past six days she had experienced heart palpitations which last for ten to fifteen minutes and left shoulder discomfort. *Id.* Plaintiff also reported nausea, vomiting and a sore throat during the same period. *Id.* Plaintiff did not have any change in activity or exercise, but said she had not "had any workout and gym" for the past six days. *Id.* Dr. Aboutaleb reported plaintiff's left arm exhibited "a normal range of motion, no tenderness and no pain." [AR 338.] Dr. Aboutaleb's notes indicate that plaintiff was to undergo an "Electrocardiogram" and "to return to clinic if [there was] no improvement." [AR 339.]

On May 5, 2010, plaintiff returned to Dr. Aboutaleb's office for a follow-up visit after she presented in the emergency room for chest pain. [AR 347-348.] Dr. Aboutaleb notes indicate:

> She has been in the ED for [] chest pain and has cardiac enzyme and EKG and stress ECHO which all came [back] unremarkable. She feels her chest pain is much better. Her father in law passed away recently and her family are in grief of the los[s] and feels more anxious and stress out, and wants to get some meds to help for [her] anxiety. She denys [sic] depression and no SI/SA[8] thought. She also complains of R lower back pain x 3 days, worse with turning to the sides and bending over, no heavy physical activity.

[AR 348.] The "psychiatric review" section indicates that plaintiff was "negative for depression, suicidal ideas, hallucinations and memory loss. [She] is nervous/anxious. Does not have insomnia. There is no substance abuse." [AR 348.] Plaintiff was diagnosed with anxiety disorder and prescribed Lorazepam; one tablet, twice a day, as needed for anxiety. [AR 349-351.] Plaintiff's cardiac workup was negative and there was no evidence of the GERD. [AR 349.] She was informed to "return to clinic if [there was] no improvement." *Id.*

---

[8] "SI" appears to indicate suicidal ideation and "SA" appears to indicate suicidal attempt.

On July 19, 2010, plaintiff went to the hospital and was admitted for five days for fever, chills, nausea, vomiting, and non-bloody diarrhea. [AR 356.] A CT scan revealed inflammation in the descending colon and possible early signs of appendicitis. *Id.* Her fever and other symptoms subsided and she was released, but she continued to have diarrhea one to three times a day. *Id.* On August 26, 2010, plaintiff saw Dr. Aboutaleb to follow-up on her emergency room visit. [AR 355.] Dr. Aboutaleb's notes indicate that plaintiff was "positive for malaise/fatigue. . . abdominal pain and diarrhea." [AR 355, 357.] She was also positive for neurological weakness. [AR 357.] However, she was negative for chest pain, palpitations, nausea, vomiting, or headaches. *Id.* She had some lab work done and was told to return to clinic if there was no improvement. [AR 358.]

On November 26, 2010, plaintiff had a routine follow-up visit with her podiatrist, Michael Simons, for her osteoarthritis of ankle/foot. [AR 370.] Plaintiff reported intermittent lower back pain, occasional knee pain, and intermittent paresthesia[9] in the upper part of the first metatarsal phalangeal joint area. *Id.* Plaintiff rated the pain in her left foot as a seven out of ten, and the pain in the right foot as a three out of ten – which is the same as she initially reported to Dr. Simons on September 25, 2009. [AR 274, 370.] The "quality" of plaintiff's pain is described as "burning, aching." [AR 370.] The report indicates that plaintiff "walks four miles, 1.5 hrs on level terrain every day." *Id.* Plaintiff's diagnosis indicates osteoarthritis of her ankle/foot, bunion, hammer toe, flat foot, and foot pain. [AR 373.] Dr. Simons found no evidence of an acute fracture or joint dislocation based on plaintiff's x-ray. [AR 372.] Plaintiff was advised "per non-impact exercise" and given a prescription for "new extra depth shoes and custom foot orthoses." [AR 373.] She was advised to return in one year for a follow-up visit. [AR 376.]

---

[9] Paresthesis is "a sensation of pricking, tingling, or creeping on the skin that has no objective cause." https://www.merriam-webster.com/dictionary/paresthesia

16cv1534-CAB-KSC

On January 27, 2011, plaintiff had an MRI of her pituitary gland. [AR 532.] On February 11, 2011, radiologist Gary A. Press, M.D., completed a report of the diagnostic imaging. [AR 532-535.] Dr. Press compared the results of plaintiff's January 27, 2011 MRI against her previous MRIs taken on February 7, 2010, and November 4, 2008. [AR 533.] Dr. Press cautioned, "interpretation of the current study is limited because no films older than 11/4/08 are available for comparison." *Id.* Dr. Press reported a rind of soft tissue measuring 3-4 mm, but stated it has not changed since the November 4, 2008 MRI. *Id.* He found that it "is stable on the current study." *Id.* Next, Dr. Press identified a 2-3 mm rind, which he notes "has certainly not increased in size since 11/4/08 and may instead have decreased in height." *Id.* Finally, Dr. Press discussed "a small nodule of T1 hyperintensity along the mid course of the pituitary stalk." [AR 534.] Dr. Press noted this finding had not been previously emphasized and appears to be growing "slowly but steadily overtime." *Id.* In the MRI taken on November 4, 2008, the hyperintense focus measured 2.5 mm. [AR 533.] In the follow-up MRI taken on February 7, 2010, "the stalk had increased slightly in size measuring 3.4 by 2.2 mm." *Id.* The hyperintense focus measured 4.1 by 3.1 mm in the most recent MRI. *Id.*

On March 7, 2011, plaintiff saw Dr. Mafong for a routine follow-up appointment for her pituitary adenoma. [AR 402.] In his report, Dr. Mafong observed a recent MRI "showed mild increase in size of posterior pituitary stalk area compared to 2008, [but] not much change in size compared to MRI measurements in 2010." [AR 403.] Dr. Mafong's progress notes indicate that plaintiff's "mood, affect and judgment [were] normal." [AR 405.] Dr. Mafong "speculate[d] that one possible explanation for the growing T1 hyperintense nodule [] would be ectopic accumulation off [sic] neurosecretory vesicles containing posterior pituitary hormones above the notch in the stalk that represents a functional stalk transection." [AR 407.] Dr. Mafong's assessment/plan for plaintiff indicates that her intrapituitary mass will require serial monitoring. *Id.* Dr. Mafong instructed plaintiff to schedule an MRI in one year and schedule a follow-up visit with him in one year. *Id.*

16cv1534-CAB-KSC

On March 10, 2011, plaintiff visited Dr. Aboutaleb for shoulder and neck problems. [AR 414.] Plaintiff reported pain in her left shoulder and neck for the past four to five months, with no injury or fall. [AR 415.] The pain (rated as a four to six out of ten) had increased in the past several weeks, making sleep difficult. *Id.* Dr. Aboutaleb noted decreased range of motion, tenderness, pain, and spasms in the cervical back. [AR 416.] Dr. Aboutaleb's progress notes indicate that plaintiff was "positive for neck pain" and "positive for myalgias and joint pain." [AR 415.] She was "negative for headaches." *Id.* Dr. Aboutaleb prescribed plaintiff medication for her pain, including Hydrocodone-Acetaminophen and Cyclobenzaprine, and referred plaintiff to see a physical therapist. [AR 417.]

Approximately one month later, on April 4, 2011, plaintiff saw physical therapist ("PT") Cara Rose Maithiasen for shoulder pain. [AR 423.] Plaintiff reported intermittent shoulder pain, varying from zero to six out of ten. [AR 424.] PT Maithiasen noted, "[p]atient presents with seemingly 2 distinct impairments of left shoulder pain with contraction, elongation and palpation of the infraspinatus tendon as well as closing pattern cervical restriction with left neck and upper trap pain." *Id.* PT Maithiasen indicated that plaintiff had "pain with lifting arm above 50 degrees for doing hair" and "pain with pushing and pulling for vacuuming." [AR 425.] The section titled "date of onset" of plaintiff's injury indicates that "[p]laintiff reports the pain began 1 year ago after taking Zocor, MD instructed her to wear a sling for 2 weeks at that time, but pain got worse. The pain has now been on and off for a year, but has worsened over the last 2 months and is now sharp in her shoulder as well as the ache in the neck." *Id.* PT Maithiasen's short-term treatment plan was to "reassess [plaintiff's] shoulder pain after 2 weeks of ice and rest." *Id.* PT Maithiasen's long term treatment plan indicated two physical therapy sessions weekly for twelve weeks. [AR 425.] The "activities/exercise" section indicates that plaintiff "walk[ed] 4 miles per day x 5 per week." *Id.* There was no indication of dizziness based on plaintiff's exam. [AR 426.]

13

On April 25, 2011, during a follow-up appointment with PT Maithiasen, plaintiff reported "feeling better over the last few weeks with less pain, but she feels that she slept on her neck wrong last night and has sharper neck pain today. She notes she forgets to use her right hand with cleaning so she began putting her left arm in a sling when she cleans as a reminder." [AR 435.] In her report, PT Maithiasen noted improvements in the range of motion in plaintiff's shoulder and neck. [AR 437.] During a subsequent physical therapy session on May 9, 2011, plaintiff reported straining her shoulder lifting a bag of potatoes; however, plaintiff stated overall she experienced improved movement and decreased pain over the past two weeks. [AR 444.] Approximately four weeks later, on May 31, 2011, plaintiff saw Dr. Aboutaleb for a hand problem of "twitching of hands." [AR 452.] Plaintiff reported twitching of her left hand for two months and her right hand for two weeks. *Id*. Plaintiff also reported left shoulder pain and no significant improvement with the physical therapy. *Id*. She also reported upper and lower back pain and discomfort for two weeks. *Id*. Dr. Aboutaleb's treatment plan included electrolytes and good hydration, among other vitamin supplements. [AR 455.] Regarding plaintiff's complaints for shoulder and back pain, she was advised to continue the physical therapy and consider the injection if there was no improvement. *Id*.

On October 13, 2011, plaintiff saw Debra L. Becker, R.N., to discuss her diabetes care management. [AR 479.] The report indicates that plaintiff's daily routine is as follows:

> [She] gets up at 5 am. Eats banana then goes for 5 mile walk, 1 hr 45 min around Miramar Lake with 3 friends. When returns home takes daughter to school. Eats breakfast 9:30-10 am: cereal or toast. Lunch 2 pm: sandwich, turkey with lettuce. Dinner 7-8 pm: chicken, rice, salad, ranch dressing, water or coke zero.

*Id*. A plan was proposed for plaintiff's continued diabetes care management including various diabetes medications and use of a new glucometer, which was to be approved by her primary care provider. [AR 481.]

On November 1, 2011, plaintiff saw Dr. Aboutaleb to discuss fatigue she had experienced for two weeks. [AR 491.] Plaintiff said "she feels tired and drag[s] herself to walk and drowsy and sleepy, no new med and no change in her diet." [AR 492] In a section titled "Review of Systems," Dr. Aboutaleb noted that plaintiff was "[n]egative for depression, suicidal ideas, hallucinations and substance abuse. The patient is not nervous/anxious." [AR 493.] Dr. Aboutaleb ordered some laboratory tests of plaintiff, including her "TSH" level, and also educated her about "hydration and regular exercise." [AR 495.] Plaintiff was instructed to return to clinic if there was no improvement. *Id*.

On November 7, 2011, plaintiff saw Dr. Simons, her podiatrist, for her annual foot exam. [AR 505-506.] Plaintiff was given a new prescription for "extra depth shoes and shoe inserts" and was told to return in one year for a routine follow-up exam. [AR 510.] On November 18, 2011, plaintiff saw Dr. Haripal A. Singh for an upper respiratory infection she had experienced for five days. [AR 515-516.] Plaintiff's "active problem list" included the following: (1) DM2, Uncontrolled; (2) Elevated Transaminase Measurement; (3) Hyperlipidemia; (4) Adenoma of Pituitary; (5) GERD; (6) Hypothyroidism; (7) Diabetes Insipidus; (8) Hypopituitarism; (9) Case/Care Management; (10) Fatty Liver; (11) Hyperprolactinemia; (12) Chest Pain. [AR 516-517.] In the section titled "Physical Exam," plaintiff's psychiatric report indicated that her "[a]ffect and judgment [were] normal." [AR 518.] Plaintiff's neurological system was found to be "negative for dizziness and headaches." *Id*. Plaintiff was prescribed Cheratussin AC for her "congestion and sore throat." [AR 518-520.]

### B. *Medical Evidence During the Unqualified Period (after December 31, 2011)*

On April 15, 2013, plaintiff saw a neurologist, Dr. Grisolia, who noted that plaintiff's pituitary tumor had been stable "up to about one year ago."[10] [AR 588.] Dr. Grisolia's report concluded that plaintiff "is felt to have very significant persistent

---

[10] There is no evidence in the record that an MRI was taken at this time to confirm or deny this assertion.

15

disability based on the diffuse joint pains, superimposed fibromyalgia syndrome and the residuals of her pituitary brain tumor."[11] *Id.* However, the letter also stated on the same page that "[c]hronic pain began with a motor vehicle accident[12] resulting in low back pain and is gradually worsened over time, in line with her depression." *Id.*

On April 23, 2014, plaintiff was evaluated by Milton Lessner, Ph.D for a psychological evaluation. [AR 72, 78, 556.] Plaintiff was referred to Dr. Lessner by Dr. Harry Henderson, plaintiff's psychiatrist. [AR 556.] Dr. Lessner administered a series of psychological tests, including: (1) Mooney Problem Checklist; (2) Rotter Incomplete Sentence Blank; (3) Bender Gestalt; (4) Beck Depression Inventory; and (5) Minnesota Multiphasic Personality Inventory-2. [AR 562-563.] Dr. Lessner noted plaintiff's responses indicated "an intense state of anxiety and turmoil," and that she "seems to be in perennial phase of sadness, dysphoria, and hopelessness." [AR 563.] Dr. Lessner's report includes a detailed description of plaintiff's symptoms, including, but not limited to, appearing disoriented, reporting hallucinations, feeling apprehensive, having difficulty concentrating, feeling insecure, and a preoccupation with suicidal ideation. [AR 563-564.] Dr. Lessner diagnosed plaintiff with Bipolar I Disorder with psychotic features and Borderline Personality Disorder, and gave her a Global Assessment of Functioning ("GAF") score of 30. [AR 567.] His diagnostic impression also indicated the following: (1) Brain Pituitary Tumor; (2) Diabetes II; (3) Vertigo; (4) Neck and back pains; (5) Fibromyalgia; (6) Headaches; and (7) Fatigue. *Id.*

In a letter dated May 9, 2014, Dr. Nadine Sidrick noted that plaintiff "is a patient of [hers] at the Colonial Corner Medical Group since October 2012." [AR 579.] Dr. Sidrick indicated in her letter that she has treated plaintiff for the following conditions: (1) Insulin

---

[11] This is the first time that fibromyalgia in noted plaintiff's medical records, as there is no indication of it in her records during the qualified period.

[12] It is unclear based on the medical evidence in the record to which motor vehicle accident Dr. Grisolia refers.

16cv1534-CAB-KSC

Dependent Diabetes Mellitus; (2) Left Carpal Tunnel Syndrome; (3) Chronic Vertigo; and (4) Polyarthritis of the knees, elbow and back. *Id.* Dr. Sidrick's letter includes a "Physical Capacities Evaluation" form completed by plaintiff on April 15, 2014. [AR 580.] In Dr. Sidrick's opinion, plaintiff has the following residual functional capacities:

> She can only sit for four hours a day with a 15-minute break every hour. She can walk or stand only two hours a day with a 15-minute break every hour. She cannot use her left hand for lifting or carrying, and cannot grasp, push or pull or do any fine manipulation with the left hand. She can only use her right hand for lifting up to five pounds. She cannot squat, crawl, climb. She cannot use her legs for any repetitive movements. She is restricted from being around unprotected heights due to vertigo, and to being around moving machinery. She is also restricted from driving automotive equipment.

[AR 579.] The record includes "Adult Progress Notes" signed by Dr. Sidrick summarizing plaintiff's appointments on seven different occasions.[13] [AR 571-77.] The notes, which are handwritten, and illegible in some instances, appear to be consistent with Dr. Sidrick's May 9, 2014 opinion, summarized above.

On May 16, 2014, Dr. Harry Henderson, a psychiatrist, wrote "a follow-up psychiatric evaluation" for plaintiff." [AR 582.] He notes that he has "reviewed her medical records consisting of Dr. Nadine Sidrick's treating notes, and the Lessner and Grisolia evaluations." *Id.* Dr. Henderson also reviewed his own treating notes of plaintiff, which "indicate that the patient continued to suffer severe pain or orthopedic origin and the worsening of arthritis causing swollen joints that continue to bedevil her." *Id.* Dr. Henderson opined that plaintiff "has been suffering from chronic impairments," but her most severe impairment "results from carpal tunnel syndrome and post-brain cancer treatment that cause her to be tired and exhausted due to side effects of medications,

---

[13] The Adult Progress Notes which appear to summarize plaintiff's appointments with Dr. Sidrick are dated: October 8, 2012; February 12, 2013; April 1, 2013; July 16, 2013; November 4, 2013; January 14, 2014; and May 9, 2014. [AR 571-77.]

including pain killing agents." *Id*. Dr. Henderson's asserts that he began treating plaintiff for her psychiatric condition in June 2012, although he does not reference any treatment notes or related documentation. [AR 584.] Notwithstanding this, he represents that:

> Throughout the course of treatment, I note that the patient becomes quickly confused when asked to [answer] simple questions. She shows a tendency towards excessive reaction to events and cried repeatedly throughout therapy sessions. There [was] frequent forgetfulness. Reality contact is compromised by auditory hallucinations and periods of depersonalization. Mood is usually dysphoric and is not always congruent with affect. She complained of memory loss and anxiety about her life, especially her poor health. Pain, depression and recurrent obsessive thoughts interfere with concentration and attention. She cannot recall three nouns after three minutes. She cannot perform serial 3s. Ability to concentrate upon even simple new tasks is poor. She is lethargic and shows little interest in outside activities. Psychiatric care has not prevented an aggravation of her depression and pain related symptoms. She was a former Afghanistan war refuge and has [sic] little difficulty adapting to life in the U.S. until she was found to have pituitary brain cancer[14] over ten years ago and underwent treatment. However, due to residual effects of the brain cancer, she suffers chronic vertigo and now has carpal tunnel which affects her left side (she is left handed) and prevents her from using her left hand.

[AR 582.] Dr. Henderson's psychiatric diagnosis of plaintiff indicates "Major Depression (Recurrent)" and "Post-Traumatic Stress Disorder (Chronic)." [AR 584.] He also notes that she has the following conditions: (1) chronic and throbbing headaches; (2) chronic inflammatory arthritis; (3) carpal tunnel syndrome, polyarthritis; (4) diabetes mellitus; (5) post pituitary brain cancer/chronic vertigo. *Id*. He gave her a GAF score of 48. *Id*. He concluded that her "mental disability is permanent and stationery since she began treatment in June 2012. . . . The combination of her chronic headaches and severe back pain, joint

---

[14] Notwithstanding Dr. Henderson's characterization of plaintiff's "pituitary cancer" diagnosis and her "post-brain cancer treatment," none of the physicians who evaluated or treated plaintiff during the qualified period indicated that she had pituitary or brain cancer. The physicians who evaluated or treated plaintiff during the qualified period noted that she had a "pituitary tumor" sometimes referred to as a "pituitary adenoma." [AR 207; 209.]

pain, diabetes, chronic vertigo coupled with her depression would prevent her from gainful employment." [AR 584.]

In a report dated June 24, 2014, Dr. James S. Grisolia, a neurologist, completed a report regarding a follow-up visit with plaintiff. [AR 585.] Dr. Grisolia's assessment indicates that plaintiff had fibromyalgia[15] and a benign neoplasm of pituitary gland. *Id.* Dr. Grisolia found that plaintiff was "severely disabled by her psychiatric status, as well as her disabling chronic pain syndrome." [AR 585.] Dr. Grisolia found plaintiff's condition was unchanged from prior visits.[16] *Id.* In a section of the report titled "Social History" he noted "[n]o alcohol, unable to work since 2006 due to vertigo and pain." [AR 586.]

On November 7, 2014, Dr. Henderson, a psychiatrist, wrote a letter that he described as a "follow-up psychiatric evaluation for [plaintiff] where [he] has incorporated the evaluations of Dr. James Grisolia both in May 2013 and the July 2014 recent report indicating that the patient had not improved with treatment in spite of new prescriptions for Fetzima and Depakote." [AR 589.] Dr. Henderson concluded:

> [I] agree with Dr. Grisolia's May 1, 2013 evaluation that the patient has been disabled at least since 2008 due to pituitary tumor dating from 2007 and the motor vehicle accident resulting in lower back pain. . . It is apparent after continued treatment with Ms. Nasery that she has been suffering from depression for quite sometime now, at least since 2008 after the onset of pituitary tumor and cancer treatment.

[AR 589-590.]

---

[15] There is no indication of fibromyalgia in plaintiff's medical records during the qualified period.

[16] The June 24, 2014 report indicates plaintiff's prior visits were on March 26, 2013 and May 1, 2013. [AR 585.] The record contains a report from Dr. Grisolia dated April 15, 2013, which appears to summarize her March 26, 2013 visit. [AR 588.] There is nothing in the record confirming plaintiff's May 1, 2013 visit.

16cv1534-CAB-KSC

On February 10, 2016, plaintiff's attorney submitted a letter to the Social Security Appeals Council requesting to submit "new documentary evidence" in support of plaintiff's claim for disability. [AR 8.] Plaintiff's counsel asserts that the new documentary evidence "shows [that plaintiff suffered from] severe depression." *Id.* The new documentary evidence was a letter from M. Omar Mohabbat, M.D., a psychiatrist, based in Alabama. [AR 8.] Dr. Mohabbat's letter, dated December 8, 2015, states the plaintiff came from California for a psychiatric evaluation and treatment. [AR 9.] Dr. Mohabbat concluded that "[i]n my clinical judgment Mrs. Nasery is disabled and can't function in gainful employment on a sustained basis." *Id.*

### C. *Testimony at the Administrative Hearing*

At the Administrative Hearing on July 10, 2014, the ALJ heard testimony from plaintiff and the vocational expert. [AR 31.] Below is a relevant summary of the hearing.

### 1. *Plaintiff's Testimony*

Plaintiff testified she was 47 years old and she lived with her husband and her eighteen year old daughter. [AR 34, 39.] Her husband worked as a taxi driver and her daughter just finished high school. [AR 39.] Plaintiff graduated from high school and attended the University of Alabama for three years, but did not receive a degree. [AR 34-35.] Plaintiff said she had a driver's license and was physically able to drive. [AR 35.]

Plaintiff was not employed at the time of the hearing. [AR 36.] In response to the ALJ's question about why she stopped working plaintiff explained:

> Well, back then, my kids just became teenagers. So – and my husband decided I could stay home. He didn't want, you know, have bad friend and go, you know, do drugs and stuff. So I decided to quit. The same time, of course, I was having all these problems.
>
> And my vertigo really got worse. I don't want to have vertigo and fall down and hit your head somewhere. Then I can't take care of you, and you're working and have two kids. So I decided to stay home with them. But then I stay home, everything is getting worse, and my depression gets worse.

16cv1534-CAB-KSC

[AR 36.]

Plaintiff said she suffered from the following problems: vertigo, depression, back pain, joint pain, a knee problem, arthritis in her left toes, pain in her left arm, cholesterol, high blood pressure, thyroids, and a pituitary tumor. [AR 36.] Plaintiff said was diagnosed with a pituitary tumor in 1999, and "she has all these problems because of the tumor." [AR 37.] Plaintiff also said that she has insipidus diabetes and carpal tunnel syndrome in her left (dominant) hand, which can become numb or locked in a fixed position. *Id.* Plaintiff also testified that she had difficulty concentrating and remembering things. [AR 39-40.] In connection with her vertigo, plaintiff said that she sometimes has "four-sided vertigo." [AR 38.] Plaintiff testified to experiencing "four-sided vertigo" almost every day, usually when sleeping. *Id.* Symptoms included feeling like the ceiling is spinning and an inability to see. *Id.* Plaintiff testified it has caused her to fall out of bed and vomit. *Id.* When the ALJ asked plaintiff what happens if she just remains still, she said she is "good." *Id.* However, quick movements, like turning around quickly, can cause nausea and the sensation that the room is spinning. *Id.*

Plaintiff stated that she is taking medication for her diabetes and vertigo. [AR 37-38.] Plaintiff said she experienced no side effects from the medication and that it offers intermittent relief from her symptoms. [AR 37.] Plaintiff said she took Meclizine for the vertigo, which helped, but also made her very tired. [AR 38.] Plaintiff also said she took medication for her brain tumor. [AR 42-43.] Plaintiff has never had surgery for the tumor, but said that if the medication does not work, she will get surgery. [AR 42-43.] Plaintiff also said that given the complications of the surgery, her doctor prefers not to do the surgery. [AR 43.]

Regarding her depression, plaintiff testified that she "feel[s] like nobody cares." [AR 39.] She said that at one point, she tried to live with her friend for a while, but her daughter does not want her to be separated from her husband. *Id.* When the ALJ asked plaintiff about her social interaction, she said she used to be very social, with many friends, but now she only has one friend. [AR 40.] She said she does not want to be

around other people and when talking to people, she feels like they are making fun of her. [AR 40.] She also said that "since [she] stopped working [she's] not bringing any money home, and [she has] just gone through so much, and [she's] always in pain." *Id.*

When the ALJ asked plaintiff about whether she sees a doctor for any of her problems, she said that she sees Dr. Henderson for her psychiatric problems, approximately every four or six weeks. [AR 40-41.] She said that seeing him helps her, but her symptoms remain. [AR 41.]

When the ALJ asked plaintiff what she does throughout the day, she said she "just stay[s] home, do[es] nothing, sit[s] in the dark. [She] do[esn't] even want to watch TV." [AR 39.] When the ALJ asked her whether she does any household chores, such as cooking, cleaning or laundry, she said that she tries, but no. *Id.*

In response to questions by her attorney, plaintiff confirmed that she has a brain tumor. [AR 42.] She said she takes medication for it, but has never had surgery to treat it. *Id.* Her attorney asked her whether she will need surgery if the medication does not work, and plaintiff said yes. [AR 42-43.] Plaintiff's attorney asked her what the prospect of surgery is and plaintiff replied:

> He said if you do a surgery, it's not going to be 100 percent removed. So then I'm going to have water coming through my nose all my life. Then they have another surgery, get a patch for my tie [sic], and then do another surgery – put, like, a patch in there. And if there's too many complications, he rather not do it. I just – I have so much severe headaches that I cannot tolerate it, then he might have to do the emergency surgery.

[AR 43.]

Plaintiff's attorney asked whether she can use her left arm for work and plaintiff said she cannot. *Id.* Plaintiff also said she has "polyarthritis." *Id.*

### 2. *Vocational Expert*

The vocational expert ("VE") identified plaintiff's previous past relevant work as a retail sales clerk and cashier. [AR 44.] The VE said that these positions are classified as

22

"light" and semi-skilled work, with a Specific Vocational Preparation ("SVP") of three (3). [AR 44.]

The ALJ asked the VE whether a "hypothetical" individual, similar in age, education, and past work experience as the plaintiff, would be able to do medium work (e.g., lift 50 pounds occasionally; 25 pounds frequently; sit, stand or walk for six hours; and frequently use dominant upper extremity). [AR 44.] The VE testified that such a hypothetical person would be able to perform medium work, including both of plaintiff's previous positions. *Id.*

The ALJ then proposed a new hypothetical individual, similar in age, education and past work experience, but with additional limitations. [AR 45.] The additional limitations include someone who can only sit for four hours (15 minutes at a time); needs to take hourly breaks; can walk for only two hours throughout the day; cannot use dominant hand to lift or carry and non-dominant hand can only carry five pounds; cannot use dominant hand to for gross or fine manipulation (e.g., pulling or pushing); and needs to avoid unprotected heights, machinery and driving. *Id.* The ALJ asked whether an individual, under this new hypothetical, could do past work performed by the plaintiff or any other work. *Id.* The VE testified that under the new hypothetical, there would be no past work as performed by plaintiff or other work. *Id.*

Plaintiff's attorney asked the VE whether a left-handed person who is unable to use her left arm could "do the work that [the VE] mentioned for the first hypothetical." [AR 45.] The VE answered "no, she would not be able to perform her past work or other work." [AR 46.] Plaintiff's attorney also submitted medical records from Dr. Grisolia to the ALJ, noting that the record appeared to be missing this document. [AR 46.] The ALJ said that he would admit the document to the record as Exhibit 6-F. *Id.* Plaintiff's attorney noted for the ALJ that the document from Dr. Grisolia said "that [plaintiff] is paralyzed on the left arm." *Id.*

### IV. *ALJ's Disability Analysis*

To qualify for disability benefits under the SSA, an applicant must show that he or

she is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least 12 months. 42 U.S.C. § 423(d). The Social Security regulations establish a five-step sequential evaluation for determining whether an applicant is disabled under this standard. 20 C.F.R. § 404.1520(a); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At step one, the ALJ must determine whether the applicant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(I). In this case, the ALJ found that the plaintiff had not engaged in any substantial gainful activity since January 1, 2007, the alleged onset date of plaintiff's claimed disability. [AR 20.] In addition, the ALJ concluded that plaintiff last met the insured status requirements of the SSA through December 31, 2011. *Id*.

At step two, the ALJ must determine whether the applicant is suffering from a "severe" impairment within the meaning of Social Security regulations from the date he was last insured. 20 C.F.R. § 404.1520(a)(4)(ii). "An impairment or combination of impairments is not severe if it does not significantly limit [the applicant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). For example, a slight abnormality or combination of slight abnormalities that only have a minimal effect on the applicant's ability to perform basic work activities will not be considered a "severe" impairment. *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005). Examples of basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b)(1)-(6). "If the ALJ finds that the claimant lacks a medically severe impairment, the ALJ must find the claimant not to be disabled." *Webb v. Barnhart*, 433 F.3d at 686.

Here, the ALJ found at step two that "[t]hrough the date last insured, [plaintiff] had the following severe impairments: "degenerative changes of the feet, a left shoulder

strain, and a benign pituitary tumor." [AR 20.] The ALJ reasoned that "[t]hese conditions cause more than mild limitation in activity and are therefore severe." *Id.* The ALJ also considered documentation in the record regarding plaintiff's mental impairments indicating that plaintiff's "mental impairment of anxiety disorder did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and was therefore nonsevere." *Id.* The ALJ further noted that "[t]he records reflected the claimaint's anxiety was situational prior to the date last insured and not reflective of a mental disorder." *Id.*

If there is a severe impairment, the ALJ must then determine at step three whether it meets or equals one of the listings of impairments in the Social Security regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the applicant's impairment meets or equals a listing, he or she must be found disabled. *Id.*

In this case, the ALJ concluded at step three that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [AR 22.] The ALJ reasoned that plaintiff "does not have a major joint dysfunction" and noted the "findings on appropriate medically acceptable imaging." *Id.* The ALJ further reasoned that "[t]here is no involvement of a major peripheral weight-bearing joint resulting in an inability to ambulate effectively." *Id.*

If an impairment does not meet or equal a listing, the ALJ must make a step four determination of the claimant's residual functional capacity based on all impairments, including impairments that are not severe. 20 C.F.R. § 404.1520(e), § 404.1545(a)(2). "Residual functional capacity" is "the most [an applicant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ must determine whether the applicant retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). The ALJ's determination is made "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. § 404.1520(e). A claimant is not disabled if he or she can still do his or her past relevant work. 20 C.F.R.

16cv1534-CAB-KSC

§ 404.1520(a)(4)(iv). The applicant carries the burden of proving eligibility at steps one through four. *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).

Here, the ALJ concluded plaintiff retained the residual functional capacity to perform "light semi-skilled" work. [AR 22-24.] Specifically, the ALJ found that "through the date last insured, [plaintiff] has the residual functional capacity to lift and/or carry 50 pounds occasionally and 25 pounds frequently, stand and/or walk 6 hours in an 8-hour workday, and sit 6 hours in an 8-hour workday. She could frequently use her left dominant upper extremity." [AR 22.] In addition, the ALJ concluded plaintiff was capable of performing her past relevant work as a retail sales clerk or a cashier. [AR 25.] The ALJ reasoned that the "treating source records showed the claimant had some health issues, [but] she was overall in good psychical condition." [AR 24.] The ALJ also found that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." [AR 25.] The ALJ acknowledged that although "[plaintiff]s medical records after December 31, 2011 support a worsening of [her] health," "the issue in this case is whether [she] was disabled prior to her date last insured of December 31, 2011." *Id*. As a result, the ALJ concluded plaintiff was not disabled from January 1, 2007, the alleged onset of her disability, through December 31, 2011, the date she was last insured. [17] [AR 26.]

## V. *Discussion*

To qualify for disability insurance benefits, a claimant must show that he or she was under a disability prior to the end of a period of eligibility. "[O]nly disabilities existing

---

[17] If the applicant cannot perform past relevant work, the ALJ–at step five–must consider whether the applicant can perform any other work. 20 C.F.R. § 404.1520(a)(4)(v); (g). The ALJ must consider all of the plaintiff's medically determinable impairments, including any pain that could "cause a limitation of function" and any impairments that are not "severe," and then determine the plaintiff's residual functional capacity to perform other work in the national economy. 20 C.F.R. § 404.1545(e); 20 C.F.R. § 404.1545(e); 20 C.F.R. § 416.929. As noted above, "residual functional capacity" is "the most [an applicant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). Here, the ALJ's decision does not include a step five analysis, because the ALJ concluded plaintiff was not disabled at step four.

before that time can trigger insurance benefits." *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394 (9th Cir. 1984). Here, the ALJ found that plaintiff "last met the insured status requirements of the Social Security Act on December 31, 2011." [AR 20.] Plaintiff does not dispute this finding and does not cite any authority indicating that she was not required to meet the disability requirements under SSA regulations as of December 31, 2011.

In her Motion for Summary Judgment, plaintiff argues that the ALJ's decision that plaintiff did not suffer from a disabling mental or physical impairment prior to December 31, 2011 is not supported by substantial evidence. [Doc. No. 14-1, at p. 6.] Plaintiff also argues that the ALJ's failure to either call a medical expert or to order a consultative examination is error and cause for reversal. *Id.* at p. 13. Defendant argues that the Court should affirm the ALJ's decision, because the ALJ's analysis and decision were supported by substantial evidence in the record and are legally sufficient. [Doc. No. 16-1, at p. 5.]

### A. *The ALJ Properly Considered Plaintiff's Alleged Mental Impairment at Step Two.*

At step two, the ALJ was required to consider whether plaintiff had "a severe medically determinable physical or mental impairment . . . or combination of impairments." 20 C.F.R. § 404.1520(a)(4)(ii). With respect to evaluating the severity of plaintiff's claimed mental impairment, the ALJ was required to apply "a special psychiatric review technique." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 725 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520a). "An ALJ's failure to comply with 20 C.F.R. § 404.1520a is not harmless if the claimant has a colorable claim of mental impairment." *Id.* at 726 (internal citation and quotation omitted).

Specifically, Section 404.1520a first requires the ALJ to evaluate the claimant's symptoms, signs, and laboratory findings to determine whether the claimant has a "medically determinable impairment." 20 C.F.R. § 404.1520a(b)(1). The ALJ must then "rate the degree of functional limitation resulting from the impairment(s)." 20 C.F.R.

27

§ 404.1520a(b)(2). The claimant's "degree of functional limitation" is rated in the following "four broad functional areas": "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). Degrees of limitation in the first three categories are rated on a five-point scale: "None, mild, moderate, marked, and extreme." 20 C.F.R. § 404.1520a(c)(4). A numerical scale of none to four or more is used to rate the degree of limitation in the fifth category, episodes of decompensation. *Id.* If the degree of limitation in the first three functional areas is determined to be "none" or "mild," the ALJ will generally find that the claimant's mental impairment is "not severe." 20 C.F.R. § 404.1520a(d)(1). "The decision must include a specific finding as to the degree of limitation in each of the functional areas" described above. 20 C.F.R. § 404.1520a(e)(4).

As noted above, the ALJ concluded at step two that through the date last insured, plaintiff had the following severe impairments: "degenerative changes of the feet, a left shoulder strain, and a benign pituitary tumor." [AR 20.] However, the ALJ concluded that plaintiff's "mental impairment of anxiety disorder did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and was therefore nonsevere." *Id.* The ALJ further noted that "[t]he records reflected the claimaint's anxiety was situational prior to the date last insured and not reflective of a mental disorder." *Id.* With respect to activities of daily living; social functioning; and concentration, persistence, and pace, the ALJ said plaintiff only had "mild limitations." [AR 23.] The ALJ also concluded there was no evidence of any episodes of decompensation. [AR 23.]

In her Motion for Summary Judgment, plaintiff argues that substantial evidence does not support the ALJ's determination that plaintiff did not have a severe mental impairment prior to December 31, 2011. [Doc. No. 14-1, at pp. 14-15, 19-20.] First, plaintiff argues that her treating psychiatrist, Dr. Henderson, opined that plaintiff's mental disabling impairments date from at least 2006, when plaintiff stopped working. *Id.* at p. 14. Plaintiff also contends that in finding that plaintiff's depression was "non-severe," the ALJ

committed errors of law, "including (i) making an adverse credibility determination, and (ii) wrongfully disregarding the opinion of the claimant's treating physicians at Kaiser Permanente during 2008 to 2011." *Id.* at pp. 19-20.

In the Court's view, plaintiff's argument overlooks too much of the record. When the record is viewed as a whole and in context, it is apparent that plaintiff did have one instance when she suffered from anxiety in connection with her father-in-law's death. [AR 348.] However, even during that visit, the medical records indicate that she was "negative for depression, suicidal ideas, hallucinations and memory loss." *Id.* There is no objective medical evidence in the record during the qualified period to support plaintiff's assertion that she was depressed or suffered from any mental impairment during the insured period. In fact, during the qualified period, plaintiff's medical records indicate that on several different occasions, several different doctors observed that plaintiff was "negative for depression" [AR 228, 493] and that her "[m]ood, affect, and judgment [were] normal." [AR 293, 310, 329, 405.] The last medical record contained in the qualified period is dated November 18, 2011, and there are no mental impairments listed in her active problem list. [AR 516-518.] In fact, on November 18, 2011, one month before the end of plaintiff's qualified period, her psychiatric report indicates that her "[a]ffect and judgment [were] normal." [AR 518.] The ALJ's reasoning and decision is consistent with the objective medical evidence in the record. He found:

> [Plaintiff] reported some anxiety in May 2010 secondary to her father-in-law passing away, but no depression (Exhibit 1F, p. 144). There was insufficient evidence of continued psychiatric complaints, psychiatric care, psychological counseling, or use of psychotropic medications prior to the date last insured. The records reflected the claimant's anxiety was situational prior to the date last insured and not reflective [of] a mental disorder.

[AR 20.]

After plaintiff's insurance coverage lapsed on December 31, 2011, plaintiff's medical records reflect a different story. Plaintiff saw several doctors, including Dr.

Grisolia, who broadly concluded that plaintiff was "severely disabled by her psychiatric status." [AR 585.]    For example, plaintiff saw Dr. Mohabbat, a psychiatrist, who concluded on December 8, 2015 that "plaintiff was disabled and can't function in gainful employment on a sustained basis." [AR 8-9.] Similarly, Dr. Lessner, who performed a series of psychological tests on plaintiff, concluded on April 23, 2014 that plaintiff had Bipolar I disorder with psychotic features and Borderline Personality Disorder. [AR 567.] On November 7, 2014, Dr. Henderson, a psychiatrist, concluded that plaintiff "has been disabled at least since 2008 due to pituitary tumor dating from 2007 and the motor vehicle accident resulting in lower back pain . . ."[AR 589-590.]

However, the Court finds that the ALJ's reasoning and decision is consistent with the objective medical evidence in the record during the qualified time period. The ALJ relied on specific facts from plaintiff's medical evidence during this period to find that "there was insufficient evidence of a severe mental condition prior to the date last insured of December 31, 2011." [AR 22.] For example, the ALJ noted that there was an April 2014 psychological evaluation by Dr. Milton Lessner diagnosing the claimant with a bipolar disorder with psychotic features. *Id*. The ALJ briefly summarized Dr. Lessner's report, but then concluded that he "give[s] the findings and opinions of Dr. Lessner very little weight because his report of April 2014 does not establish a mental impairment prior to the date last insured of December 31, 2011." [AR 20-21.] The ALJ also cited to and summarized a May 2014 report from plaintiff's psychiatrist, Dr. Harry Henderson, noting that plaintiff began psychiatric care with him in June 2012. [AR 21.] The ALJ also noted that Dr. Henderson had reviewed the claimant's medical records from Dr. Sidrick, Dr. Lessner, and Dr. Grisolia. *Id*.  The ALJ noted that Dr. Henderson opined that "the claimant had a major depressive disorder" and that "claimant was not capable of gainful employment." *Id*. (internal citation omitted). However, the ALJ concluded that he "give[s] the findings and opinions of Dr. Henderson very little weight because they do not establish that the claimant had a debilitating mental impairment prior to the date last insured of December 31, 2011." *Id*.

1    The ALJ noted that he gave great weight to the findings and opinions of Dr.

2    Amado[18] and Dr. Gregg, state agency psychological consultants, who reviewed the

3    medical evidence of record on August 2012 and January 2013, respectively. *Id.* Both Dr.

4    Amado and Dr. Gregg opined that plaintiff "had no severe mental impairment prior to the

5    date of the last insured." *Id.* (internal citations omitted). The ALJ explained that Dr.

6    Amado and Dr. Gregg's opinions were consistent with plaintiff's "treating source records

7    [which] consistently showed normal psychiatric findings prior to the date last insured."

8    *Id.* (internal citations omitted). The ALJ specifically noted that plaintiff "denied

9    depression and anxiety at her November 2008 psychological examination" and her

10   "March 2010 clinical appointment show[ed] a normal mood and affect." *Id.* (internal

11   citations omitted).

12        The ALJ also considered the four broad functional areas[19] set forth in the disability

13   regulations for evaluating mental disorders and in section 12.00C of the Listing

14   Impairments, sometimes referred to as the "paragraph B" criteria. [AR 21 (internal

15   citation omitted).] In evaluating these functional areas, the ALJ relied on objective

16   evidence in plaintiff's treatment records which indicated that she "walked five miles a

17   day with her friends." [AR 21 (internal citation omitted).] The ALJ also noted that

18   plaintiff "did not have fatigue, depression, or anxiety" and that "[t]here were records that

19   repeatedly emphasized that the claimant was in good health physically and mentally." *Id.*

20   (internal citation omitted).] The ALJ concluded that these records also supported his

21   finding that there was insufficient evidence of a severe mental condition prior to the date

22   last insured of December 31, 2011. *Id.* at pp. 21-22.

---

25   [18] The ALJ incorrectly refers to Dr. Amado as Dr. Armado throughout his decision. For consistency, the
26   Court refers to Dr. Amado by the correct name as indicated by the medical evidence. [AR 53.]

27   [19] The four broad functional areas are: (1) daily living; (2) social functioning; (3) concentration,
28   persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. §404.1520a(e)(4).

16cv1534-CAB-KSC

Accordingly, based on a thorough review of the record as a whole, this Court cannot agree with plaintiff's contention that "plaintiff had disabling mental impairments prior to December 2011." [Doc. No. 14-1, at p. 14.]

**B. *The ALJ Gave Proper Weight to the Opinions of the State Agency Psychological Consultants, Dr. Amado and Dr. Gregg.***

Plaintiff argues that the ALJ erred in relying on the two state agency psychological consultants' opinions of Dr. Amado and Dr. Gregg. [Doc. No. 14-1, at p. 19.] The final decision of the Commissioner must be affirmed if it is supported by substantial evidence and if the Commissioner has applied the correct legal standards. *Batson* v. *Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). In order to satisfy the substantial evidence standard, all that is required is "relevant evidence" that a "reasonable mind might accept as adequate to support a conclusion." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999) (internal citations omitted). Furthermore, "the reports of consultative physicians called in by the Secretary may serve as substantial evidence." *Magallanes v. Bowen,* 881 F.2d 747, 752 (9th Cir. 1989) (internal citations omitted).

Here, the ALJ's decision to place "great weight" on Dr. Amado and Dr. Gregg's opinions to determine that the claimant had no severe mental impairment prior to the date last insured is supported by substantial evidence. [AR 21.] The ALJ corroborated the findings of Dr. Amado and Dr. Gregg's medical reports with the objective medical evidence of plaintiff's treating source records during the qualified period, before December 31, 2011. *Id.* As summarized above, the ALJ cited to specific exhibits in the medical record which supported that plaintiff's "treating source records consistently showed normal psychiatric findings prior to the date last insured." *Id.* Therefore, it was reasonable for the ALJ to rely on the state agency psychological consultants, Dr. Amado and Dr. Gregg, as their opinions were consistent with plaintiff's treating physicians' medical records during the qualified period. Accordingly, the ALJ's preferential treatment of Dr. Amado and Dr. Gregg's opinions was supported by substantial evidence.

*C. **The ALJ Provided Specific, Legitimate Reasons for Giving Little Weight to the Opinions of the Treating Physicians, Dr. Lessner, Dr. Henderson, Dr. Sidrick, and Dr. Grisolia.***

Next, plaintiff argues that the "ALJ completely ignored the medical opinions of the claimant's primary treating physicians at Kaiser Permanente and of Dr. Sidrick and Dr. Grisolia."[20] [Doc. No. 14-1, at p. 19.] Notably, all four of these treating physicians saw plaintiff *after* the qualified period and their findings contradict the findings of plaintiff's treating physicians during the qualified period. Plaintiff fails to articulate the relevant legal standard and neglects to provide this Court with specific case law supporting plaintiff's legal conclusion. *Id.* at pp. 19-20.

Generally, the opinion of a treating physician is given great weight because a treating source has a "greater opportunity to know and observe the patient as an individual." *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987). "However, the opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan*, 169 F.3d at 600. Rather, when a conflict exists between the opinions of a treating physician and an examining physician, the ALJ can disregard the opinion of the treating physician if he or she sets forth "specific, legitimate reasons for doing so that are based on substantial evidence in the record."[21] *Sprague*, 812 F.2d at 1230 (merely referencing treating physician's opinions, without providing specific reasons for disregarding them, was insufficient to satisfy the substantial evidence standard). The ALJ can satisfy this burden by providing a "detailed and thorough summary of the

---

[20] Although plaintiff's argument on this issue does not specifically include Dr. Lessner or Dr. Henderson, the Court includes them in this section for consistency and thoroughness.

[21] This is distinguishable from the more stringent standard applied to uncontroverted opinions of a plaintiff's treating physician, which requires the ALJ to provide "clear and convincing reasons" for rejection. *See Montijo v. Secretary of Health and Human Services*, 729 F.2d 599, 601 (9th Cir. 1984) ("The administrative law judge is not bound by the uncontroverted opinions of the claimant's physicians on the ultimate issue of disability, but he cannot reject them without presenting clear and convincing reasons for doing so.").

16cv1534-CAB-KSC

facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes*, 881 F.2d at 751 (internal citations omitted). In doing so, the ALJ must "set forth his own interpretations and explain why they, rather than the doctors, are correct." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988) (remanded for further consideration where ALJ failed to provide sufficiently specific reasons for disregarding the opinions of three treating physicians and one consulting physician).

Here, the opinions of four of plaintiff's treating physicians, Dr. Henderson, Dr. Lessner, Dr. Sidrick, and Dr. Grisolia, who saw plaintiff during the unqualified period, are contradicted by the findings of the state agency medical consultants, Dr. Amado, Dr. Gregg, Dr. Lizarraras, and Dr. Spinka. The opinions of plaintiff's treating physicians during the unqualified period contradict the opinions of the plaintiff's treating physicians during the qualified period, who never noted that she was "disabled" and found that she was negative for depression. [AR 338; 405; 437; 493.] By contrast, on April 23, 2014, Dr. Lessner diagnosed plaintiff with bipolar disorder with psychotic features (among other conditions) and found that she "seems to be in perennial phase of sadness, dysphoria, and hopelessness." [AR 563.] Similarly, Dr. Sidrick, who first saw plaintiff in October 2012 found on April 15, 2014 that plaintiff had significant limitations in her residual functional capacities which limited her to less than sedentary work. [AR 579; AR 24.] Dr. Henderson also opined on May 16, 2014 that plaintiff had significant limitations preventing her from the ability to work.[22] [AR 584, AR 21.] Finally, another one of plaintiff's treating physicians, Dr. Grisolia, opined on June 24, 2014 that plaintiff was "severely disabled by her psychiatric status, as well as her disabling chronic pain syndrome." [AR 585.] While

---

[22] Dr. Henderson further noted that plaintiff's "mental disability is permanent and stationery since she began [psychiatric] treatment [under his care] in June 2012. . . . The combination of her chronic headaches and severe back pain, joint pain, diabetes, chronic vertigo coupled with her depression would prevent her from gainful employment." [AR 584; AR 21.]

his first visit with plaintiff was on March 26, 2013, he found that she has been "unable to work since 2006 due to vertigo and pain." [AR 585; 586.]

Meanwhile, state agency medical consultants concluded, on more than one occasion, that plaintiff retained a markedly higher residual functional capacity and was not disabled.[23] [AR 52-60.] The consultative examiner, Dr. Lizarraras, found that plaintiff could sit, stand, and walk for six hours in an eight hour workday and could lift fifty pounds occasionally and twenty-five pounds frequently, contrary to Dr. Sidrick's medical opinion. [AR 54-55.] Therefore, because of these markedly different opinions, the ALJ must enumerate specific, legitimate reasons, supported by substantial evidence and sufficient analysis, in order to justify rejecting the opinions of the treating physicians.

Consistent with controlling Ninth Circuit precedent, the ALJ here provided specific, legitimate reasons supported by substantial evidence and detailed analysis for rejecting the plaintiff's treating physicians' opinions.

First, the ALJ relied on specific medical evidence in the record to support his finding that plaintiff could perform light-skilled work as a retail sales clerk and cashier. [AR 25.]

---

[23] On August 20, 2012, Dr. Lizarraras, completed a Physical Residual Functional Capacity Assessment in connection with plaintiff's initial disability determination. [AR 54-55.] Dr. Lizarraras concluded that plaintiff was able to lift and/or carry 50 pounds occasionally ("1/3 or less of an 8 hour day") and 25 pounds frequently ("more than 1/3 up to 2/3 of an 8 hour day"). [AR 54.] Dr. Lizarraras opined that plaintiff could stand and/or walk (with normal breaks) for "6 hours in an 8-hour workday." *Id.* Dr. Lizarraras also said that plaintiff could sit (with normal breaks) for "6 hours in an 8-hour workday." *Id.* Dr. Lizarraras determined plaintiff had no postural limitations, but had manipulative limitations reaching overhead with her left arm. [AR 54-55.] Dr. Lizarraras also considered plaintiff's pain and "[m]ild symptoms related to mild hypopituitarism." *Id.*

On August 21, 2012, Dr. Amado completed a Psychiatric Review of plaintiff. [AR 52-53.] Dr. Amado determined that plaintiff had "[n]o mental medically determinable impairments." [AR 53.] Dr. Amado noted in relevant part: "Psych issues are addressed only indirectly and in passing in the [plaintiff's] Kaiser MER on file, and psych impairments are not included in the 'active problems' list. There is no indication that a significant psych issue was present and demanding treatment, but in any case there is Insufficient Evidence to adjudicate. . . ." [AR 53.]

On January 29, 2013, Dr. Gregg conducted a Reconsideration Analysis of plaintiff's psychiatric claim, and affirmed the initial decision as written. [AR 60.] On January 31, 2013, Dr. Spinka conducted a Reconsideration Analysis of plaintiff's physical residual functional capacity assessment claim and found, "I have reviewed the evidence in the file and the assessment of 8/21/12 is affirmed as written." *Id.*

The ALJ referenced at least sixteen separate examination reports of plaintiff during the qualified period, with dates ranging from October 2008 to November 2011, and examination reports of plaintiff during the unqualified period, with dates ranging from October 2012 to May 2014. [AR 23-24.] For example, the ALJ summarized a March 2011 examination record as follows:

> The March 2011 annual appointment for her pituitary tumor check-up showed her tumor had been slowly growing over time. Her doctor recommended no change in medication, but closer monitoring – though I noted he told the claimant to return in one year. She reported left shoulder pain in March 2011. Her doctor noted she had some decreased range of motion, diagnosed her with a shoulder strain, and referred to her to physical therapy. The therapist stated the claimant improved with therapy and her pain decreased, and her range of motion and functional tolerance increased. The claimant continued to walk 4 miles a day, 5 days a week.

[AR 23-24 (internal citations omitted).] Similarly, the ALJ noted that during a November 2008 physical examination, "[s]he denied depression or anxiety, back pain, or any fatigue." [AR 23.] After a detailed analysis of plaintiff's medical records during the qualified period, the ALJ concluded that while "the treating source records showed the claimant had some health issues, she was overall in good physical condition."[24] [AR 24.]

Next, the ALJ cited to plaintiff's medical records during the unqualified period and found that those records "showed the claimant had diabetes mellitus, a pituitary tumor, and depression." [AR 24.] The ALJ specifically noted that although plaintiff alleged vertigo, she "declined medication for her vertigo, stating the medication would be too expensive." *Id.* The ALJ summarized Dr. Sidrick's May 2014 evaluation form, and explained that he

---

[24] The ALJ further concluded that "while [plaintiff] did have her orthotic foot inlays redone each year, she continued to walk several miles a day for exercise – indicative of an ability to stand and walk for at least 6 hours in an 8-hour workday. There were no records stating the claimant had difficulty sitting. She did have a shoulder strain, but the therapist reported the claimant improved with therapy. . . . However, the therapist did not report the claimant returned to full motion or that she could use her shoulder without pain, thus I find she could frequently use her left dominant upper extremity." [AR 24.]

36

1    gave them "little weight because her opinions post-date the claimant's last insured date of

2    December 2011 by almost 2 ½ years, thus they lack temporal relevancy." [AR 24.] The

3    ALJ further explained that the medical records prior to the date last insured do not support

4    the limitations that Dr. Sidrick opined, noting that "those records showed the claimant was

5    in good health was very active – walking several miles a day." *Id.*

6        Next, the ALJ summarized the opinions of the state agency medical consultants, Dr.

7    Lizarraras and Dr. Spinka, that "the claimant had the residual functional capacity to

8    perform medium exertional work with frequent overhead reaching with the left upper

9    extremity because of shoulder pain and limited motion." [AR 24 (internal citations

10   omitted).] The ALJ explained that he gave "great weight" to the opinions of the state

11   agency medical consultants because their opinions were "consistent with the treating

12   source records showing the claimant had some degenerative changes in her feet and some

13   left upper extremity pain and reduced motion." *Id.* This is consistent with the Social

14   Security Administration's Code of Federal Regulations.[25]

15        Accordingly, the ALJ relied on specific, legitimate reasons to support his conclusion

16   that plaintiff could perform light-skilled work as a retail sales clerk and cashier. Given the

17   sufficiency of the ALJ's reasoning and analysis, the ALJ was justified in giving less weight

18   to the opinions of plaintiff's treating physicians during the unqualified period.

19    **D.** ___The ALJ's Residual Functional Capacity Assessment at Step Four Is Not___

20        ___Supported by Substantial Evidence.___

21        In her Motion for Summary Judgment, plaintiff argues that "in determining a

22   claimant's residual functional capacity, the ALJ must consider all relevant evidence in the

23   record, including medical records, lay evidence, and the effects of symptoms, including

24   pain, that are reasonably attributed to a medically determinable impairment." [Doc. No.

25   14-1, at p. 17 (internal citation omitted).] Although the issue is not specifically addressed

26

27

28    [25] "Generally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion." 20 CFR § 404.1527(c)(4).

in plaintiff's moving papers, it is unclear from the ALJ's decision whether and to what extent the ALJ considered plaintiff's non-severe mental impairment at step four of the disability analysis. In other words, the ALJ determined at step two that plaintiff had a "medically determinable mental impairment of anxiety disorder [that] did not cause more than *minimal limitation*" to her ability to "perform basic mental work activities and was therefore nonsevere." [AR 20 (emphasis added).] The ALJ did not conclude plaintiff had no limitations caused by her mental impairment. *Id*. Nevertheless, the ALJ did not include a discussion of any "minimal" limitations caused by plaintiff's mental impairment in the residual functional capacity assessment and did not state how any such limitations impacted her ability to work.

SSA regulations state that a residual functional capacity assessment must consider all of a claimant's "medically determinable impairments . . . , including [the claimant's] medically determinable impairments that are not 'severe.'" 20 C.F.R. § 404.1545(a)(2). SSA regulations further state that a disability analysis must "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. . . . [T]he combined impact of the impairments will be considered throughout the disability determination process. . . ." 20 C.F.R. § 404.1523.

The residual functional capacity assessment must address the claimant's exertional capacity (*i.e.*, the length of time the claimant is able to sit, stand, walk, carry, push and pull) and nonexertional capacity (*i.e.*, stooping, climbing, reaching, handling, seeing, hearing, and speaking). SSR 96-8P, 1996 WL 374184, at *5-6. The assessment must also address mental limitations and restrictions: "Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8P, 1996 WL 374184, at *6.

If it is determined as a result of the residual functional capacity assessment at step four that a claimant cannot do any of her "past relevant work," then "the same assessment" of the claimant's "residual functional capacity" is used at step five to determine if the claimant "can adjust to any other work that exists in the national economy." 20 C.F.R. § 404.1545(a)(5)(ii); 20 C.F.R. § 404.1520(g)(1). At this step of the analysis, certain vocational factors must also be considered to determine whether the claimant can adjust to other work. These factors include the claimant's age, education, and work experience. 20 C.F.R. § 404.1520(g)(1).

"[A] conclusion that the claimant's mental impairments are non-severe at step two does not permit the ALJ simply to disregard those impairments when assessing a claimant's [residual functional capacity] and making conclusions at steps four and five. In his [residual functional capacity assessment], the ALJ must consider the combined effect of *all* medically determinable impairments, whether severe or not." *Wells v. Colvin*, 727 F.3d 1061, 1068-1069 (10th Cir. 2013). "'The mental [residual functional capacity] assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments. . . .'" (*i.e.*, activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation). *Id.* at 1069, quoting SSR 96-8P, 1996 WL 374184, at *4.

Here, the ALJ's residual functional capacity assessment includes a detailed discussion of plaintiff's exertional and nonexertional capacities that relate to her alleged "severe" physical impairments (*i.e.*, "degenerative changes of the feet, a left shoulder strain, and a benign pituitary tumor"). [AR 20-25.] However, the ALJ's decision does not include any analysis as to how plaintiff's ability to function in a work setting is affected by her "mild limitation" in mental functioning in the areas of daily living, social functioning, and concentration, persistence, and pace. [AR 22.] With respect to mental capacity, the ALJ acknowledged in his decision that "[t]he mental residual functional capacity

assessment at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions . . . . Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." [AR 22.] The ALJ's decision, however, does not indicate how or if plaintiff's "mild limitations" [AR 22] in mental functioning affect her ability to "understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8P, 1996 WL 374184, at *6. As a result, it is not possible to determine whether the ALJ actually considered any such "mild limitation" in plaintiff's mental functioning as part of her residual functional capacity assessment. [AR 20-25.]

There is evidence in the medical treatment records suggesting that during the qualified period, generally, plaintiff's "mood, affect, and judgment [were] normal." [AR 329.] However, she still had times when she was "nervous/anxious" and she was diagnosed with anxiety disorder on May 5, 2010. [AR 348-351.] In addition, there is testimony by the vocational expert suggesting that the outcome of the case could have been different if the ALJ's analysis considered "the combined impact" of all plaintiff's "severe" physical impairments (*i.e.*, "degenerative changes of the feet, a left shoulder strain, and a benign pituitary tumor") and her "non-severe" mental impairment (*i.e.*, her "mild limitations" in mental functioning). 20 C.F.R. § 404.1523. [AR 22-26.] For example, the vocational expert indicated that all work would be eliminated for an individual who is limited to light work but "needs to break every hour. . . ." [AR 44-45.]

Based on the foregoing, this Court cannot conclude that the ALJ's residual functional capacity assessment at step four of the disability analysis is supported by substantial evidence and/or free from legal error. The ALJ's residual functional capacity assessment at step four is incomplete. Notwithstanding that the ALJ concluded at step two that plaintiff had "mild limitations" in daily living, social functioning, concentration, persistence, and/or pace [AR 20], his decision does not include any analysis as to how these

"mild limitations" in mental functioning impacted the residual functional capacity assessment at step four of the disability analysis. Accordingly, the ALJ's residual functional capacity analysis at step four is not supported by substantial evidence and constitutes legal error.

### E. *The ALJ's Rejection of Plaintiff's Pain Testimony Is Not Supported by Substantial Evidence.*

Plaintiff contends that the ALJ erred in finding her not credible. [Doc. No. 14-1, at pp. 17.] Specifically, plaintiff argues that "the ALJ failed to provide clear and convincing reasons for finding the claimant's alleged pain and symptoms not credible." *Id.* at p. 20. Defendant opposes plaintiff's argument noting that "[t]he ALJ properly discounted plaintiff's credibility" based on "multiple, valid reasons supported by the record." *Id.* at pp. 8-9 (internal citations omitted).

Plaintiff testified at the hearing that she has "back pain," "joint pain," and "pain all over." [AR 36.] She said that in 2006 her "vertigo really got worse" which was one of the reasons she stopped working in 2006. [AR 35-36.] She also said she has "a knee problem . . . arthritis in [her left toes,] and [her] left arm's been hurting for a long time." [AR 36.] She said that sometimes her left hand "gets numb" and that on the day before the hearing, "[her] hands were, like, stuck. They wouldn't even move, and [she] has so much pain." [AR 37.] She said she takes "a lot of medications," which help "sometimes[,] [but] usually not." [AR 37.] As summarized above, plaintiff's medical treatment records indicate that she has been treated for her various medical conditions, and that her pain is sometimes managed but not completely controlled by medication. [AR 318; 370-376; 414-416.]

"Pain of sufficient severity . . . may provide the basis for determining that a claimant is disabled." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). "[A] claimant need not present clinical or diagnostic evidence to support the severity of his pain. . . ." *Id.* In turn, an ALJ may not reject "excess pain testimony" based solely on a lack of objective medical support in the record. *Id.* at 792-793.

"In assessing the credibility of a claimant's testimony regarding subjective pain or

41

the intensity of symptoms, the ALJ engages in a two-step analysis. First, the ALJ must determine whether there is 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.' If the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give 'specific, clear and convincing reasons' in order to reject the claimant's testimony about the severity of the symptoms. At the same time, the ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).' In evaluating the claimant's testimony, the ALJ may use 'ordinary techniques of credibility evaluation.' For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, [such as] . . . 'whether the claimant engages in daily activities inconsistent with the alleged symptoms.' While a claimant need not 'vegetate in a dark room' in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting. Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina v. Astrue*, 674 F.3d 1104, 1112-1113 (9th Cir. 2012) (internal citations omitted).

First, it is unclear from the ALJ's decision whether and to what extent plaintiff's claims of chronic pain impacted the residual functional capacity assessment at step four of the disability analysis. [AR 21-25.] The ALJ's decision includes several conclusory statements about plaintiff's overall symptoms. First, the decision states that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." [AR 25] Second, the decision summarizes select testimony from plaintiff at the hearing and then concludes that "[t]he claimant was not fully credible." [AR 25.] In his summary of plaintiff's testimony from the hearing, the ALJ said "she stated

42

that she mostly stayed home and watched television." *Id.* Notably, the ALJ's summary of plaintiff's testimony on this issue is not accurate. Plaintiff said that she "just stay[s] home, do[es] nothing, sit[s] in the dark. [She doesn't] even want to watch TV." *Id.*

Third, the ALJ concluded in his decision that "[plaintiff's] allegation of memory problems seemed partially at odds with her testimony detailing her alleged limitations." *Id.* Notably, the decision does not provide any specific basis for this conclusion or any citation to evidence in the record or the hearing transcript.

Additionally, the ALJ fails to specifically address any limiting effects of plaintiff's testimony of vertigo, chronic pain, or that she "could not use her left arm for 'anything.'" [AR 25.] Instead, the decision merely concludes that "[plaintiff's] good health prior to December 31, 2011 was well documented by the medical records." *Id.* The vocational expert testified that past work or other work would be eliminated for an individual who "cannot use the left dominant hand for lifting or carrying. . . ." [AR 45.] Since the ALJ concluded plaintiff had the residual functional capacity to perform her past work as a retail sales clerk and cashier, it is apparent that he rejected plaintiff's pain testimony and testimony about her inability to use her left dominant arm. [AR 25, 45.] However, this Court was unable to discern clear and convincing reasons in the ALJ's decision to support a complete rejection of this testimony.[26] Therefore, it is this Court's view that the ALJ did not meet his burden of establishing at step four of the disability analysis that plaintiff has the residual functional capacity to perform her past work. Accordingly, for this additional reason, the ALJ's residual functional capacity assessment at step four of the disability analysis is not supported by substantial evidence and constitutes legal error.

///

///

---

[26] Although the ALJ appropriately relied on plaintiff's demeanor at the administrative hearing as a reason to discredit her testimony, this reason alone is not enough to discredit her testimony as a whole.

16cv1534-CAB-KSC

## F. _The ALJ Adequately Developed the Record and Was Not Required to Call a Medical Expert and/or Order a Consultative Exam._

Plaintiff acknowledges that "the burden of demonstrating a disability lies with the claimant," but argues that "the ALJ has a duty to assist in developing the record." [Doc. No. 14-1, at p. 12 (citing _Armstrong v. Commissioner of Soc. Sec. Admin._, 160 F.3d 587, 589 (9th Cir. 1998); 20 C.F.R. §§ 404.1512(d)-(f); _id._ at §§ 416.912(d)-(f); _Sims v. Apfel_, 530 U.S. 103, 110-11 (2000)).] Plaintiff further argues that "[o]ne of the means available to an ALJ to supplement an inadequate medical record is to order a consultative examination," and that, here, "the ALJ's failure to either call a medical expert or to order a consultative examination is error and cause for reversal." _Id._ at pp. 12-13. Plaintiff contends that the "exact onset date of plaintiff's impairments is at issue here based on the assessments of Dr. Sidrick and Dr. Henderson." [AR 14-1, at p. 10 (citing 42 U.S.C. § 423(c); _Johnson v. Shalala_, 60 F.3d 1428, 1432 (9th Cir. 1995)).] Plaintiff further contends that the "medical record is replete with the findings of plaintiff's treating physicians that the plaintiff has been suffering from chronic pain, vertigo, and severe foot shoulder and neck pain caused by diabetes insipidus prior to December 2011." _Id._ Defendant argues that the ALJ was not required to seek expert or lay witness testimony because "the record was neither ambiguous nor inadequate for [sic] allow for a proper evaluation of the medical record." [Doc. No. 16-1, at p. 6 (citing _Mayes v. Massanari_, 276 F.3d 453, 459-60 (9th Cir. 2001) citing _Tonapetyan v. Halter_, 242 F.3d 1144, 1150 (9th Cir. 2001)).] Defendant further argues that "the evidence relating to a mental impairment significantly postdated the date Plaintiff was last insured." _Id._ at p. 7 (internal citations omitted).

The mere fact that some of the records post-date plaintiff's qualified period for insurance does not in itself render those records irrelevant to the disability determination. _See Smith v. Bowen_, 849 F.2d 1222, 1225 (9th Cir. 1988) (in general, "reports containing observations made after the period for disability are relevant to assess the claimant's disability"). Indeed, as the Ninth Circuit has explained, "medical reports are inevitably rendered retrospectively and should not be disregarded solely on that basis." _Id._; _see also_

1   *Lingenfelter v. Astrue*, 504 F.3d 1028, 1033 n. 3 (9th Cir. 2007) (noting that medical reports

2   made after the plaintiff's disability insurance lapsed were relevant and were properly

3   considered by the ALJ and the Appeals Council under *Smith*). However, in this case, for

4   the reasons explained herein, the ALJ adequately considered the medical evidence and

5   opinions of plaintiff's treating physicians during the unqualified period. The ALJ gave

6   specific and legitimate reasons to reject the opinions of plaintiff's treating physicians

7   during the unqualified period, as their opinions contradicted the objective evidence in the

8   record during the qualified period, the opinions of plaintiff's treating physicians during the

9   qualified period, and the opinions of the state's consultative examiners. [AR 23-25.]

10   Plaintiff fails to establish that there was evidence of an ambiguity as to the exact onset date

11   of plaintiff's alleged disability, particularly in light of the fact that the ALJ never found

12   that plaintiff had a disability.[27]

13       Accordingly, the Court finds that the ALJ adequately, fully and fairly developed the

14   record, and the ALJ was not required to call a medical expert and/or order a consultative

15   examination.

16                    ***VI.***   ***Recommendation***

17       Based on the foregoing, this Court concludes that the ALJ's residual functional

18   capacity assessment at step four of the disability analysis is not supported by substantial

19   evidence in the Administrative Record and constitutes legal error. First, the ALJ's

20   decision is incomplete, because it does not include an analysis of how plaintiff's ability

21   to function in a work setting is affected by her "mild limitations" in mental functioning.

22   [AR 22-25.] Second, the ALJ's decision is incomplete because it is apparent that the ALJ

23   rejected plaintiff's pain testimony but did not provide clear and convincing reasons for

24

25   [27] Plaintiff also argues that the ALJ "erred in not seeking lay testimony." [Doc. No. 14-1, at p. 17.]

26   Specifically, plaintiff argues that the ALJ can fulfill the responsibility to create complete record on the onset date by calling a medical expert, or if medical testimony is unhelpful, exploring lay evidence. *Id.*

27   Plaintiff's argument that the ALJ erred in not seeking lay testimony is unfounded because there was no ambiguity about the exact onset date of plaintiff's alleged disability.

28

doing so. *Id.* A decision to remand for further investigation and development of the record is appropriate when outstanding issues remain that must be resolved before a determination of disability can be made. *Treichler v. Comm'r of Social Sec. Admin.*, 775 F.3d 1090, 1106-1107 (9th Cir. 2014). Accordingly, **IT IS RECOMMENDED THAT THE DISTRICT COURT**:

1.    **GRANT** plaintiff's Motion for Summary Judgment [Doc. No. 14] to the extent is seeks a remand for further proceedings; and

2.    **DENY** defendant's Cross-Motion for Summary Judgment [Doc. No. 16].

3.    **REMAND** the matter to the Commissioner for further consideration, investigation, and development of the record consistent with this Report and Recommendation; and

4.    **ENTER** judgment in plaintiff's favor.

This Report and Recommendation is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Civil Local Rule 72.1(d). Within fourteen (14) days after being served with a copy of this Report and Recommendation, "any party may serve and file written objections." 28 U.S.C. § 636(b)(1) (B) &(C). The document should be captioned "Objections to Report and Recommendation." The parties are advised that failure to file objections within this specific time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1156–57 (9th Cir.1991).

**IT IS SO ORDERED**.

Dated: August 4, 2017

Hon. Karen S. Crawford
United States Magistrate Judge

16cv1534-CAB-KSC